UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL HINES,

                     Plaintiff,

       - against -

FIRST UNUM LIFE INSURANCE COMPANY,

                    Defendant.

**OPINION AND ORDER**

14 Civ. 2961 (ER)

Ramos, D.J.:

      Plaintiff Michael Hines brings this action against Defendant First Unum Life Insurance Company ("First Unum"), appealing First Unum's decision to deny Plaintiff's claim for long-term disability ("LTD") benefits pursuant to the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (2012).  Plaintiff also seeks equitable relief for breach of fiduciary duty under § 1132(a)(3)(B).  The parties have submitted cross-motions for summary judgment.  (Docs. 12, 18).  For the following reasons, First Unum's motion is GRANTED, and Plaintiff's motion is DENIED.

## I.    BACKGROUND[1]

### A.  The Plan

      Plaintiff seeks LTD benefits under a Group Policy Plan (the "Plan") that First Unum issued to Plaintiff's former employer, Viacom, Inc. ("Viacom").  Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") (Doc. 24) ¶ 1; AR 61–100.

---

[1] All facts in this section are taken from the parties' Rule 56.1 statements and the Administrative Record (referred to herein as "AR"), and are undisputed unless otherwise noted.

The Plan gives First Unum "discretionary authority to make benefit determinations under the Plan," which include "determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan." Defendant's Rule 56.1 Statement ("Def.'s 56.1") (Doc. 13) ¶ 2; AR 98.  The Plan provides that First Unum's benefit determinations "must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim," provides claimants with the right to seek judicial review under ERISA to challenge benefit decisions, and states that "[t]he court will determine the standard of review it will apply in evaluating those decisions."  Pl.'s 56.1 ¶ 2; AR 98.

The Plan defines disability as follows:  "You are disabled when Unum determines that: you are *limited* from performing the *material and substantial duties* of your *regular occupation* due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."  Pl.'s 56.1 ¶ 3 (emphasis added); AR 76.  The Plan defines "limited" to mean "what you cannot or are unable to do."  AR 90.  It defines "material and substantial duties" as duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified."  *Id.*  It defines "regular occupation" to mean "the occupation you are routinely performing when your disability begins."  AR 92.

The Plan requires claimants seeking benefits to submit a "Proof of Disability" that includes "the cause of your disability; [and] the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation[.]"  Pl.'s 56.1 ¶ 8.

Plaintiff's coverage under the Plan ended on "the last day" of his "active employment" with Viacom.  Pl.'s 56.1 ¶ 9; AR 74.  "Active employment" is defined as performing the "material and substantial duties" of Plaintiff's "regular occupation" for at least thirty-five hours a week.  Pl.'s 56.1 ¶ 10; AR 65, 89.  Plaintiff states that his last day of active employment was

2

May 11, 2011, while First Unum asserts that it was April 27, 2011.  Defendant's Rule 56.1 Statement ("Def.'s 56.1 Resp.") (Doc. 21) ¶ 11.

The Plan requires that a claimant seeking benefits "must be continuously disabled through [the] elimination period," which is 180 days (the "Elimination Period").  Pl.'s 56.1 ¶ 7; AR 65, 76.  Therefore, Plaintiff's eligibility for benefits turns on whether he became "disabled" under the Plan *on or before* May 11, 2011, and whether he remained "disabled" for 180 days thereafter. *See* Defendant's Brief in Support of Summary Judgment Motion ("Def.'s Br.") (Doc. 14) 5 n.1.

**B.  Plaintiff's History of Injury, Treating Doctors, and Workers Compensation Review**

In January 2011, Plaintiff was forty-four years-old and working as an Accounts Payable Supervisor for MTV Networks Financial Services, a subsidiary of Viacom.  Def.'s 56.1 ¶ 11; AR 261, 386–89.  On January 25, 2011, Plaintiff was sitting at his desk readying for a conference call when, as he turned for the phone, his neck froze and started causing Plaintiff pain.  Pl.'s 56.1 ¶ 13.

On January 26, 2011, Plaintiff sought treatment and diagnosis from Peter J. Bruno, M.D., a clinical associate professor of medicine at New York University School of Medicine.  Dr. Bruno reported that Plaintiff suffered from "severe muscle spasms of the right neck" and "a herniated disc in his cervical spine with weakness in his right arm," and advised Plaintiff to stay out of work until January 28, 2011.  AR 298; *see also* Pl.'s 56.1 ¶¶ 14–16.

Dr. Bruno referred Plaintiff to Michael G. Dempsey, D.O., a physiatrist, whom Plaintiff also visited on January 26, 2011.  AR 210.  Based on his right-side neck pain, Dr. Dempsey diagnosed Plaintiff with cervical radiculopathy.  *Id.*  Dr. Dempsey told Plaintiff he could return to work, but recommended that he seek physical therapy and request an ergonomic setup at work in order to avoid a worsening of his conditions.  Def.'s 56.1 ¶ 14; Plaintiff's Memorandum of

3

Law in Support of Cross-Motion for Summary Judgment ("Pl.'s Br.") (Doc. 23) 2. According to Plaintiff, he requested an ergonomic setup at work on February 12, 2011, which was approved by his employer but never actually implemented. Def.'s 56.1 ¶ 15; AR 162.

Plaintiff saw Dr. Dempsey again on March 2, 2011, complaining of lower-left back pain, and was diagnosed with lumbar radiculopathy. AR 235. On March 17, 2011, Dr. Dempsey ordered MRIs of the cervical and lumbar spine, but neither were undertaken. *Id.* The notes from these days say nothing about Plaintiff's ability to work.

April 27, 2011 appears to be the last day that Plaintiff reported to work, though the record is unclear as to whether Plaintiff was paid for two additional weeks and/or was still considered to be technically employed for those two weeks. *See, e.g.*, Plaintiff's Response (Counter) to Defendant's Rule 56.1 Statement ("Pl.'s 56.1 Resp.") (Doc. 26) ¶ 16; AR 200; Pl.'s Br. at 2. Regardless, it is undisputed that Plaintiff's employment was formally terminated on May 11, 2011 because his position was being relocated to Nashville, Tennessee, and Plaintiff was unable to move there. *See* Pl.'s Br. at 2; AR 122, 159.

Plaintiff visited Dr. Dempsey on May 11, 2011, the day he was terminated. Dr. Dempsey's notes from that day state that Plaintiff said he was "laid off 2 w[eeks] ago." AR 211. Dr. Dempsey also noted that Plaintiff never underwent MRIs because of his "work schedule." *Id.* Based on the May 11 examination, Dr. Dempsey drafted a note on May 16, 2011 in which he checked the box that labeled Plaintiff "partially disabled for an indefinite period of time," and stated that Dr. Dempsey had previously "indicated [that Plaintiff] needed ergonomic adjustments to his office space to accommodate his disability," adjustments which "ha[d] not been made" as of May 16. Def.'s 56.1 ¶ 21; AR 110. The May 16 note says nothing further about Plaintiff's

ability to work, and Dr. Dempsey did not check the box that would have labeled Plaintiff "unable to perform any of his[] regular duties."  AR 110.

Plaintiff saw Dr. Bruno on May 16, 2011, complaining of depression and anxiety.  Dr. Bruno notes states that Plaintiff had "[l]ost job."  AR 260.  There is no mention of neck or back pain or of Plaintiff's ability to work.  *Id.*

On May 19, 2011, Plaintiff filed his LTD benefits claim with First Unum.  AR 2.

Plaintiff saw Dr. Bruno again on May 23, 2011, who noted that Plaintiff presented with cervical disc displacement, muscle spasms, and joint pain.  AR 259.  That same day, Dr. Bruno drafted a letter stating that Plaintiff had seen Dr. Bruno on January 26, 2011 with neck pain and was referred to Dr. Dempsey, who "advised an ergonomic set up at his office and therapy."  AR 111.  The letter further stated as follows:  "[Plaintiff] has been working since January 28, 2011 until May 11, 2011.  His symptoms have worsened since his job requires him to use the computer and phone on a regular basis."  *Id.*[2]

Plaintiff saw Dr. Dempsey again on May 31, 2011, complaining of continuing neck and right shoulder pains.  AR 168, 496.  He also saw Dr. Bruno on June 14, 2011 for what was described as a sleep disorder.  AR 258.

On July 5, 2011, Dr. Dempsey filled out a "Disability Claim Form" provided by First Unum, in which he diagnosed Plaintiff with cervical radiculopathy and sciatica.  *See* AR 138–40; *see also* Pl.'s 56.1 ¶ 18.  On the form, Dr. Dempsey states that he advised Plaintiff to stop working on April 27, 2011, and when asked when he expected Plaintiff "to improve to return to

---

[2] The Administrative Record contains another version of Dr. Bruno's May 23, 2011 letter that is unsigned. Compared to the signed letter, the unsigned version (i) includes one additional sentence—"His symptoms were works carrying a heavy bag at work" [sic], (ii) lists April 27 as Plaintiff's last day of work instead of May 11, and (iii) states that Plaintiff's symptoms "have not resolved" instead of "have worsened."  *Compare* AR 297 (unsigned), *with* AR 111 (signed).

work," Dr. Dempsey wrote "unknown."  AR 138–40.  As for Plaintiff's functional capacity, Dr. Dempsey estimated that Plaintiff could sit, stand, and walk 1-33% of the time, engage in fine finger movements, hand/eye coordinated movements, and pushing/pulling 1-33% of the time, lift/carry up to 10 lbs. 1-33% of the time (and never anything more), and never climb, twist/bend/stoop, reach above shoulder level, or operate heavy machinery.  *Id.*  When asked whether he had advised Plaintiff to return to work, Dr. Dempsey checked the "No" box, but did not fill out the sections asking for Plaintiff's "Current Restrictions" and "Current Limitations," and did not answer the yes/no question of whether he supported Plaintiff's return to work within those current restrictions and limitations.  *Id.*

In early August 2011, Plaintiff submitted a workers compensation claim seeking benefits for his work-related disability.  Pl.'s 56.1 ¶ 25; AR 166.

On August 10, 2011, Plaintiff saw Dr. Dempsey, who drafted a note that differed from his May 16, 2011 note.  *Compare* AR 168, *with* AR 110.  Specifically, rather than categorizing Plaintiff as "partially disabled for an indefinite period of time" like he did on May 16, Dr. Dempsey instead checked the boxes labeling Plaintiff as "unable to return to work for an undetermined period of time," "totally disabled for an indefinite period of time," and "disabled and unable to perform any of his/her regular duties" as of April 28, 2011, all of which were due to the injuries Plaintiff suffered "in the work related injury of 1/25/11."  AR 168.

Dr. Bruno drafted a letter on August 12, 2011 in which he described Plaintiff's condition on January 26, 2011 and stated that, based on subsequent examinations up through August 12, Plaintiff's "condition continued to deteriorate and he has obtained little to no relief from his work related/occupational injuries."  AR 170.  Dr. Bruno wrote that the deterioration could be "directly attributed to his not being providing with an ergonomic setup and his job requirements

6

to use computers and the telephone." *Id.*  He also wrote that, based on his own examination of Plaintiff on August 12, he was "in agreement with Dr. Dempsey's diagnosis of August 10, 2011. [Plaintiff] is not able to return to work for an undetermined period of time, he is totally disabled for an indefinite period of time, and continues to be disabled and unable to perform his regular job duties for an indefinite period of time." *Id.*  Dr. Bruno repeated this opinion—that Plaintiff was disabled and unable to perform his regular job duties for an indefinite period of time—at least four more times in similar letters drafted in September and November of 2011, and in April and June of 2012.  *See* Pl.'s 56.1 ¶ 23; AR 169–74.[3]

On August 30, 2011, Dr. Dempsey again ordered a cervical MRI, but it was not performed until January 2012.  *See* AR 212, 214.

As part of his workers compensation claim, Plaintiff was examined on October 27, 2011 by Richard D. Semble, M.D., Diplomate of the American Board of Orthopedic Surgery.  Pl.'s 56.1 ¶ 27; AR 287–90.  In addition to his own physical examination, Dr. Semble reviewed the medical records from Dr. Bruno and various reports and forms from Dr. Dempsey.  AR 288.  In his report, after describing the results of the physical exam, Dr. Semble stated a diagnosis of "[a]cute cervical strain with spasm, manifested with a limited range of motion."  AR 288–89.  He also found Plaintiff to exhibit "weakness in the right-upper-extremity, significant loss of range of motion in the right-shoulder, low-back pain and sensory deficits in the right-lower-extremity."

---

[3] This series of letters plainly demonstrates Dr. Bruno's opinions that (i) Plaintiff's January 25, 2011 incident and subsequent injuries were the result of work-related repetitive motion trauma, (ii) that Plaintiff required "convalescence…from working on computers and from phone calls" plus ergonomic assistance at work, and (iii) that Plaintiff's condition continued to deteriorate both during his last three months of work (due to a lack of ergonomic assistance) and after his termination.  AR 169–74.  And once again, each letter concludes with Dr. Bruno's opinion that, as of the date of writing, Plaintiff "remains incapacitated for an indefinite period of time as a result of his occupational and repetitive motion injuries," and is "completely disabled from performing his regular job functions for an indefinite period of time."  *Id.*  None of the letters, however, specifically pinpoint the date or time when Plaintiff crossed the critical threshold—from able to work with ergonomic accommodations, to unable to work at all.

AR 289.  All told, Dr. Semble concluded that Plaintiff's "particular injuries do not appear to be consistent with the minimal rotary incident that occurred on January 25, 2011," noting that Plaintiff had suggested his past year of "overtime managing multiple phones etc….may be the source of his other complaints," and that Plaintiff's "weakness in the right-upper-extremity may be related to the cervical injury," for which an MRI had already been indicated (by Dr. Dempsey) for further investigation.  *Id.*  Dr. Semble concluded that Plaintiff's right-should pain, right-low-back pain, and numbness in the right-lower-extremity were "not consistent" with the injury on January 25, 2011.  *Id.*  Finally, and most importantly, with regards to Plaintiff's cervical spine, Dr. Semble found as follows:  "[T]here is a moderate partial temporary orthopedic disability at this time.  The claimant is able to work with the following diagnosis related orthopedic restrictions.  He cannot lift, push or pull over 20 pounds.  He cannot perform any twisting spinal movements.  The claimant's medication could impact functional abilities.  The claimant should not perform safety sensitive activities while under the influence of sedating medications."  *Id.*

In January 2012, Plaintiff had an MRI of the cervical spine performed.  AR 275–77.  The report noted the following impression:  "Degenerative changes of the cervical spine most prominent at C5-C6 where there is a disc bulge effacing the ventral CSF space and resulting in left greater than right neural foraminal narrowing.  Right sided perineural cyst at C4-C5.  Scoliosis with convexity to the left likely contributing to multilevel left neural foraminal narrowing."  *Id.*

Dr. Semble received and reviewed the January 2012 MRI along with Dr. Dempsey's notes from January 26 and August 10, 2011, and from February 14, March 2, and March 7 of 2012.  AR 175.  On March 20, 2012, Dr. Semble concluded that the MRI findings "do not change my

opinion or conclusion from my report on October 27, 2011," and maintained his original opinion

that Plaintiff suffered from "a moderate partial temporary orthopedic disability." *Id.*

### C.  First Unum's Review and Determinations

Plaintiff's claim for LTD benefits was submitted to First Unum on May 19, 2011.  AR 2.

First Unum obtained all of the pertinent medical evidence, including Plaintiff's medical records

and the reports of Drs. Bruno and Dempsey, as well as information about Plaintiff's job from

Viacom.  *See* Pl.'s 56.1 ¶ 31; Pl.'s Br. at 4.

In July 2012, First Unum asked its Senior Vocational Rehabilitation Consultant, Rusty

Peavy, to identify the "material and substantial duties" of Plaintiff's "regular occupation."  Pl.'s

56.1 ¶ 31; AR 416–18.  After reviewing the job description provided by Viacom and Plaintiff's

own description of his job, Peavy concluded that the physical demands of the job were

"[e]xerting up to 10 pounds of force," "[o]ccasionally walking, standing, reaching upward,

reaching downward, [and] visual accommodation" for up to one-third of the workday,

"[f]requently reaching, handling, fingering, talking hearing, [and] near acuity" for one-third to

two-thirds of the workday, and "[c]onstantly sitting [and] keyboard use" for two-thirds or more

of the workday.  AR 418; *see also* AR 386–89 (Viacom job description for "Accounts Payable

Supervisor").[4]

First Unum next asked Bryan Hauser, M.D., who is board certified in family medicine, to

review the medical evidence and determine whether Plaintiff was unable to perform the

vocational duties identified by Peavy.  Pl.'s 56.1 ¶ 33.  Dr. Hauser issued his initial report on

August 1, 2012, relying on materials including the January 2012 MRI, Dr. Semble's workers

---

[4] In addition to Viacom's and Plaintiff's job descriptions, Peavy relied on:  *PAQ Services, Inc.'s Enhanced Dictionary of Occupational Titles*, data as of April 1, 2012; U.S. Dᴇᴘᴛ ᴏꜰ Lᴀʙᴏʀ, *The Revised Handbook for Analyzing Jobs* (1991).  AR 418.  In particular, Peavy noted that "[t]he exertional demands were determined using ERI eDOT field analysis mode data," AR 418, *i.e.*, field data from the Enhanced Dictionary of Occupational Titles.

compensation review, and a letter from Dr. Bruno dated July 19, 2012 stating that Plaintiff

"remains incapacitated for an indefinite period of time."  AR 423–24.  In the "Analysis and

recommendations" section, Dr. Hauser wrote that, since Plaintiff was able to work for

"approximately three months following the purported onset of symptoms" on January 25, 2011,

it was "not clear" why Plaintiff, as of April 28, 2011, would "lack the capacity to perform

activities he was able to perform prior to that date."  AR 424.  Dr. Hauser noted that the MRI

showed "neural foraminal narrowing," but that "the foraminal stenosis is more severe on the left

while the claimant's radicular-type symptoms are on the right," leading Dr. Hauser to conclude

"diagnostic test data is not consistent with the claimant's symptoms."  *Id.*  Further, Dr. Hauser

noted that Dr. Semble's conclusions from October 27, 2011 did not "appear to preclude the

claimant from performing the activities required for his occupation."  *Id.*  "Overall," Dr. Hauser

concluded, "it is not clear…why the claimant would lack the capacity to perform the activities

required for his occupation from 4/28/11 through 10/24/11…to the present and ongoing."  *Id.*

Dr. Hauser then stated his intent to "contact Dr. Bruno to discuss the rationale for ongoing

[restrictions and limitations]."  *Id.*

Dr. Hauser sent a letter to Dr. Bruno dated August 2, 2012, explaining that he had tried to

reach Dr. Bruno by phone that day but was unsuccessful, and that he sought "to gain a better

understanding of [Dr. Bruno's] medical opinion and discuss questions…regarding…

interpretation of the available medical data."  AR 428–30.  In the letter, Dr. Hauser summarized

the medical evidence and Plaintiff's vocational requirements as determined by Peavy, and asked

Dr. Bruno about Dr. Hauser's "concerns" that (i) it was unclear why Plaintiff would lack the

capacity as of April 28 to perform activities that he was able to perform from January 25 to April

27, (ii) the MRI showed more severe foraminal stenosis on the left side while Plaintiff's

radicular-type symptoms were on the right, and (iii) the restrictions and limitations set forth by Dr. Semble did not preclude Plaintiff from performing activities required by his occupation.  *Id.*

On August 7, 2012, Dr. Bruno examined Plaintiff in his office and wrote a letter that same day, which Plaintiff faxed to First Unum.[5]  AR 476.  In the letter, Dr. Bruno opined that Plaintiff "remains unable to perform his regular job duties to include those involving computers, extended phone calls, repetitive motions, and sitting upright for long periods of time."  *Id.*  Dr. Bruno added that Plaintiff's back pain had "further disabled usage of his right arm, elbow, wrist and hand," and that Plaintiff was at high risk of permanent damage and required immediate physical therapy and treatment.  *Id.*  Dr. Bruno also stated that Plaintiff displayed "life threatening side effects" from certain medicines and that he was thus required to take "other drugs that create extreme drowsiness and impair his ability to stay alert and function at the workplace."  *Id.*  Dr. Bruno once again concluded that Plaintiff "remains incapacitated from performing his regular job tasks for an indefinite period of time," which was "a result of damage of damage to his cervical disks, and right arm resulting from his occupational and repetitive motion injuries."  *Id.*

First Unum also attempted to contact Dr. Dempsey on August 8, 2012 to see if he was "providing any [restrictions and limitations]" to Plaintiff "or if he was deferring to…Dr. Bruno." AR 479.  The First Unum officer was told that "Dr. Dempsey retired 3 weeks ago and his office is closed," and that there was no contact number that could be used to reach him.  *Id.*

---

[5] The parties dispute whether this letter, addressed "To Whom It May Concern," was actually in response to Dr. Hauser's attempts to contact Dr. Bruno.  Def.'s 56.1 Resp. ¶ 42.  First Unum points out that the letter nowhere refers to Dr. Hauser, and does not specifically answer Dr. Hauser's questions or fill out the sections of Dr. Hauser's letter intentionally left blank for Dr. Bruno to respond to.  *See* AR 429 (providing prompts to Dr. Bruno); AR 481 (noting that Dr. Bruno "did not complete" the letter).  On the other hand, Dr. Hauser faxed his letter and called Dr. Bruno's office on August 2 and was informed that Dr. Bruno was out of the office that week, AR 478, and so given the timing, it is plausible to think Dr. Bruno simply came back the following week, examined Plaintiff anew based on Dr. Hauser's new inquiry, and drafted the letter in response.

Dr. Hauser completed his final report on August 16, 2012.  Pl.'s 56.1 ¶ 47; AR 494–99.

Dr. Hauser framed his report as an evaluation of whether the available medical information

supported a finding that Plaintiff did not have the capacity from April 28, 2011 to October 24,

2011 to perform material and substantial duties identified by Peavy.  AR 494.  Dr. Hauser noted

that his review encompassed Plaintiff's entire file submitted to First Unum, including all reports

from Drs. Bruno, Dempsey, and Semble, and that the diagnostic impairments evinced by those

records were "[c]ervical radiculopathy" and "lumbar radiculopathy."  AR 495.  Dr. Hauser

proceeded to summarize Plaintiff's medical history and clinical findings from January 25, 2011

up through Dr. Bruno's August 7, 2012 letter.  AR 495–97.  He concluded that the restrictions

and limitations from Dr. Bruno's August 7, 2012 letter were "not supported" for several reasons,

including:  (i) Plaintiff "was able to perform the activities required for his occupation on a full-

time basis for several months following the onset of symptoms"; (ii) Plaintiff's upper-extremity

symptoms were "predominantly on the right" but the MRI of his cervical spine "showed neural

foraminal narrowing predominantly on the left"; (iii) there was no electrodiagnostic data

supporting a diagnosis of cervical radiculopathy, and no diagnostic data supporting a diagnosis

of lumbar radiculopathy; (iv) "[a]bnormalities on physical examination are highly variable"; (v)

Dr. Bruno's assertion that Plaintiff's condition continued to deteriorate due to "repetitive motion-

related symptoms" for a year *after* Plaintiff stopped working; (vi) Plaintiff's failure to get an

MRI until January 2012, nearly ten months' after Dr. Dempsey's first recommendation, despite

"severe ongoing pain or significant functional limitation"; (vii) Dr. Semble's restrictions and

limitations would not preclude Plaintiff from performing required physical activities of his

occupation; (viii) other conditions unrelated to radiculopathy were not diagnosed until after

Plaintiff was terminated; and (ix) the medical documentation did not "corroborate[]" Dr. Bruno's

assertion that Plaintiff's cognition would be impaired by pain medication. AR 497–98. Dr. Hauser also concluded that Plaintiff was able to perform the physical requirements of his occupation because (i) Plaintiff allegedly suffered from the impairing conditions "for months prior to the date of disability and yet was able to perform the activities…on a full-time basis," (ii) the inconsistent abnormalities identified during physical examination were "of questionable clinical significance," and (iii) the diagnostic test findings did not "correlate well" with Plaintiff's "symptoms or the abnormalities noted on physical examination." AR 498.

Dr. Hauser referred Plaintiff's claim for a second opinion by a "Designated Medical Officer" ("DMO") for further review. *Id.*

The DMO, Joseph Sentef, M.D., who is board certified in family/occupational medicine, also reviewed Plaintiff's claim and filed his report on August 18, 2012. Pl.'s 56.1 ¶ 54; AR 513–17. Dr. Sentef reviewed and summarized the same medical records that Dr. Hauser reviewed, including the notes from all of Plaintiff's visits to Drs. Bruno and Dempsey and Peavy's determination of physical occupational requirements. AR 513–15. With respect to Plaintiff's degenerative disc disease of the cervical spine, Dr. Sentef noted that the findings related to this condition were not "suggestive of any surgical issues" and "would be consistent with age-related changes," and concluded that "there is no evidence that the claimant has anything more significant than neuroforaminal narrowing, especially on the left," both because most of Plaintiff's symptoms "appear to be on the right," and because there was "no EMG/NCS study to support anything more serious such as radiculopathy." AR 515–16. Regarding Plaintiff's "low back pain," Dr. Sentef noted that neither an MRI nor an EMG/NCS study was performed "to substantiate any complications such as lumbar radiculopathy," that Plaintiff's "[s]traight leg raising test, reflexes, gait, sensory and motor strength appear to be within normal limits," and

that Plaintiff "has been able to work despite his symptoms in the lower back" such that it did not appear that Plaintiff "would be precluded from work based on the sparse data regarding his lumbar spine."  AR 516.  Dr. Sentef also found that Dr. Bruno's concern regarding potential side effects from pain medication were "not documented by any of the other providers," nor was there any "documentation in the physical exams that the claimant has demonstrated any significant fatigue or decrease in mental awareness," and he also suggested that Plaintiff could take medication "at certain times to avoid any side effects during the day."  AR 516–17.  Dr. Sentef concluded his analysis as follows:  "Looking at all the claimant's diagnoses, both individually and collectively as a whole, it would appear that the claimant would be able to perform a sedentary occupation during the period of 4/28/2011 through 10/24/2011 as opined by [Dr. Hauser]."  AR 517.

Via letter dated August 29, 2012, First Unum notified Plaintiff that his claim was being denied.  Pl.'s 56.1 ¶ 60; AR 540.  First Unum summarized Peavy's determination of physical occupational requirements and briefly described the records submitted for review from Drs. Bruno and Dempsey.  AR 541.  First Unum then synthesized the analysis provided by Drs. Semble, Hauser, and Sentef for each of Plaintiff's medical conditions.  AR 541–42.  First Unum concluded that the information in Plaintiff's file did "not indicate a level of impairment which would cause [Plaintiff] to be unable to perform the duties of [his] occupation," relying on the fact that Plaintiff was able to work from January 2011 to April 27, 2011, that he continued to deteriorate due to repetitive motion-related symptoms for a year after he stopped working, and that Dr. Semble's recommended restrictions and limitations would not preclude Plaintiff from performing the physical requirements of his occupation.  AR 542.  First Unum thus concluded that Plaintiff's cervical and lumbar spine conditions, along with his pain medication side-effects,

either individually or collectively, would not preclude Plaintiff from performing the physical demands of his occupation on a full time basis.  *Id.*

Plaintiff appealed First Unum's determination via letter dated February 25, 2013.  Pl.'s 56.1 ¶ 65; AR 574.  Plaintiff challenged what he believed to be an artificially narrow set of physical requirements for his occupation, arguing that First Unum's vocational determination ignored several physical activities that Plaintiff was severely restricted from performing.  AR 574.  Plaintiff also argued that Dr. Semble's October 27, 2011 description and analysis of his "moderate partial temporary orthopedic disability" (i) precluded Plaintiff from "using a computer keyboard or telephone in the manner which was a normal and necessary part of [his] job functions," and (ii) occurred 179 days after Plaintiff's termination, making it "both logical and probable that even Dr. Semble's examination confirms that the disability continued for the necessary 180 days." AR 575.

First Unum assigned Plaintiff's appeal to Christopher Bartlett, M.D., board certified in family practice, who completed his review on April 4, 2013.  Pl.'s 56.1 ¶ 66; AR 608.  Dr. Bartlett's report summarized Plaintiff's medical conditions, his objections to First Unum's denial of his claim, the vocational requirements determined by Peavy, the January 2012 MRI, Plaintiff's communications with First Unum, and all of the notes and records prepared by Drs. Bruno, Dempsey, and Semble.  AR 608–12.  Dr. Bartlett ultimately concluded that the restrictions and limitations recommended by Dr. Bruno's August 7, 2012 letter were not supported. AR 612.

Specifically, Dr. Bartlett first found that Plaintiff's "reports of functional loss appear out of proportion to the clinical exams, diagnostic testing, and other file information," pointing out the following "inconsistencies":  (i) imaging findings showing more severe left-side foraminal stenosis even though Plaintiff complained more of right-side neck and arm symptoms; (ii)

15

Plaintiff's "demonstrated capacity to work 10-12 hours a day in the Spring of 2011," despite his symptoms and diagnosis in January 2011; (iii) contemporaneous physician notes from May 2011 stating that Plaintiff lost his job or was laid off, as compared to Plaintiff's later assertion that his physicians took him out of work; (iv) "complaints of deteriorating functional capacity with stable exams of neck and [right-upper-extremities]"; and (v) the fact that Dr. Semble's findings, recommendations, and limitations from October 2011 did not preclude Plaintiff's capacity to return to his job. *Id.*

Next, Dr. Bartlett opined that Plaintiff did not lack "full time functional capacity" for the physical requirements of his occupation from January 2011 through October 2011, based on Plaintiff's "demonstrated capacity to perform his own job from 1/31/11 until 4/27/11, as well as stable physical exams, and the medical documentation between January 2011 and October 2011." *Id.*

Dr. Bartlett then laid out his specific conclusions about each of Plaintiff's various diagnoses. Regarding cervical radiculopathy, Dr. Bartlett questioned whether Plaintiff's physicians actually took him out of work on April 27, 2011 due to this diagnosis, as Plaintiff and Dr. Dempsey later claimed, because the contemporaneous notes from that time suggest that Plaintiff was laid off due to non-medical issues, and because there was no recorded visit or communication between Plaintiff and Dr. Dempsey in late April. AR 613. Dr. Bartlett also noted that Dr. Semble's recommended restrictions and limitations based on Plaintiff's cervical spine symptoms would not preclude Plaintiff's capacity to perform the required physical demands of his occupation. *Id.* Regarding sciatica/lumbar radiculopathy, Dr. Bartlett found that, because no MRI had been performed, there was no evidence of any "neurosurgical referral for lumbar concerns," and the condition went unmentioned by Dr. Bruno in his 2011 letters, the

16

"[a]vailable medical information does not support that this condition would preclude performance of a mostly seated occupation." *Id.* Regarding medication side effects, Dr. Bartlett's "[r]eview of the office notes and letters in 2011 do not appear to document concerns about significant side effects." AR 614. This lack of documentation, taken together with the fact that Dr. Semble stated only that medication "could impact functional abilities" such that Plaintiff should not perform "safety sensitive activities," that side effects are often most potent at the start of dosing and level off as stable dosage continues, that Plaintiff worked for three months following his taking a narcotic in January 2011, and that "alternative pain medications are often employed" in response to negative side effects, all led Dr. Bartlett to conclude that "the available medical information does not support that medication side effects would have precluded functional capacity for a full time mostly seated occupation throughout 2011." *Id.*

Finally, Dr. Bartlett opined that the restrictions and limitations recommended by Dr. Semble's October 27, 2011 review were "reasonable," whereas the restrictions and limitations in Dr. Dempsey's August 10, 2011 note and those in Dr. Bruno's August 7, 2012 letter were "overly restrictive." *Id.* Ultimately, Dr. Bartlett concluded that the "available medical information" did not support a finding that Plaintiff "lacked the full time functional capacity" for performing the physical requirements of his occupation from January 2011 to October 2011. *Id.* He finished his report with a determination that Plaintiff's file contained sufficient information and that an additional, independent medical examination was not needed. *Id.*

Following Dr. Bartlett's review, First Unum asked Richard Byard, J.D., CRC, a senior vocational rehabilitee consultant, to consider Plaintiff's challenges to Peavy's previous determination of occupational requirements. Pl.'s 56.1 ¶ 69; AR 616. After reviewing Peavy's determination, all of the information submitted to Peavy, and other secondary sources regarding

occupational titles,[6] Byard agreed with Peavy's prior determination and found that Plaintiff's occupation required "lifting/carry/push/pull up to 10 lbs; constant sitting & keyboarding."  AR 616–17.  Byard also found that the functions Plaintiff reported in his appeal "appear[] to be job specific (i.e. 3 PCs, lifting more than 10 lbs[)]," that "[u]sing a headset is a common practice," and that Plaintiff's occupation "would be compatible with a fixed/raised workstation & accompanying stool."  *Id.*

On April 10, 2013, First Unum notified Plaintiff via letter that it was upholding its determination on Plaintiff's claim.  Pl.'s 56.1 ¶ 71; AR 620.  First Unum summarized the Plaintiff's medical conditions and Dr. Bartlett's review and analysis of his claim.  AR 621–23.  First Unum then stated its conclusion that Plaintiff was "not disabled" under the Plan through the the 180 day elimination period, from April 27, 2011 to October 24, 2011.  AR 623.  While acknowledging Plaintiff's pain, First Unum wrote that "the medical records do not document pain severe enough to preclude him from performing his regular occupation," noting that Plaintiff "can use a headset to talk on the phone and work on papers/computers at the same time," and finding that Plaintiff's reported need to lift more than 10 lbs. and work on multiple computer screens are tasks "specific to his job and not his occupation."  AR 624.  All told, First Unum concluded that Plaintiff "can perform the physical demands of the occupation within the restrictions Dr. Semble gave," and that "he is able to perform the duties of his regular occupation."  *Id.*

On July 25, 2013, Plaintiff's attorney submitted to First Unum an award for Social Security benefits (the "SSDI Award") made out to "Gregory Hudson," which Plaintiff's attorney claimed to be Plaintiff's alias.  Def.'s 56.1 ¶¶ 81–82; AR 636.  The SSDI Award was based on a finding

---

[6] Byard consulted:  *PAQ Services, Inc.'s Enhanced Dictionary of Occupational Titles*, data as of January 1, 2013; U.S. DEP'T OF LABOR, *Dictionary of Occupational Titles* (4th ed. 1991).  AR 617.

of disability on April 27, 2011.  First Unum did not consider the SSDI Award, responding to

Plaintiff's attorney on July 29, 2013 that Plaintiff's appeal had already been determined and no

further review was available.  AR 639.


## II.   LEGAL STANDARDS

### A.  Summary Judgment

To prevail on summary judgment, the movant must show that the admissible evidence

and pleadings leave "no genuine dispute as to any material fact."  Fed. R. Civ. P. ("FRCP")

56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a

verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d

454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d

Cir. 2009)).  "A 'material' fact is one that might 'affect the outcome of the litigation under the

governing law.'"  *Id.*  "The function of the district court in considering the motion for summary

judgment is not to resolve disputed questions of fact but only to determine whether, as to any

material issue, a genuine factual dispute exists."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545

(2d Cir. 2010).

The party moving for summary judgment is first responsible for demonstrating the

absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Where "the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d

Cir. 2009) (citing *Celotex*, 477 U.S. at 322–23).  If the moving party meets its burden, "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d

140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)

(quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  "When, as in

this case, both sides move for summary judgment, the district court is 'required to assess each

motion on its own merits and to view the evidence in the light most favorable to the party

opposing the motion, drawing all reasonable inferences in favor of that party.'"  *Asberry v.*

*Hartford Life & Acc. Ins. Co.*, No. 14 Civ. 69 (JMF), 2015 WL 857883, at *3 (S.D.N.Y. Feb. 27,

2015) (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*,

661 F.3d 164, 171 (2d Cir. 2011)).  Thus, "neither side is barred from asserting that there are

issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it."

*Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

## B.  ERISA

ERISA "permits a person denied benefits under an employee benefit plan to challenge that

denial in federal court."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); *see also* 29

U.S.C. § 1132(a)(1)(B) ("A civil action may be brought…to recover benefits due to [the

plaintiff] under the terms of his plan, to enforce his rights under the terms of the plan, or to

clarify his rights to future benefits under the terms of the plan.").  The plaintiff "has the burden

of proving by a preponderance of the evidence that he is totally disabled within the meaning of

the plan."  *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (internal

quotation marks omitted).  The "question of whether or not a claimant is disabled must be judged

according to the terms of the [p]olicy." *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d

397, 402 (S.D.N.Y. 2010).  "Summary judgment is the typical procedural vehicle by which

courts review a challenge to the denial of benefits under ERISA." *Wedge v. Shawmut Design &*

*Const. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 332–33 (S.D.N.Y. 2014) (citing

*Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)).

"In reviewing a denial of benefits challenged under Section 502(a)(1)(B) of ERISA, 29

U.S.C. § 1132(a)(1)(B), a court must apply a *de novo* standard 'unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan,' in which case the court must apply an abuse of discretion

standard." *Asberry*, 2015 WL 857883, at *4 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 115 (1989)); *accord Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009).  In

the context of an ERISA plan that grants discretion to the plan administrator, this more

deferential standard of review is referred to interchangeably as either an "abuse of discretion"

standard or an "arbitrary and capricious" standard.  *See, e.g.*, *Kruk v. Met. Life Ins. Co.*, No. 07

Civ. 1533 (CSH), 2009 WL 1481543, at *2 n.1 (D. Conn. May 26, 2009) ("The term 'arbitrary

and capricious' is used interchangeably with the phrase 'abuse of discretion,' and either

describes the deferential standard applied when an ERISA plan reserves discretion.").

Here, First Unum is plainly given "discretionary authority to make benefit determinations

under the Plan."  AR 98.  Conceding the existence of this language, Plaintiff nevertheless argues

that a *de novo* standard may still apply because the Plan also states that "[t]he court will

determine the standard of review it will apply in evaluating those decisions."  Pl.'s Br. at 8

(citing AR 98).  That language does not impinge on the discretion afforded First Unum, nor does

it in any way suggest that the Court should ignore the Plan's straightforward grant of discretion

and impose a *de novo* standard of review instead.  The Court will thus apply the arbitrary and capricious standard of review.  *See Pini v. First Unum Life Ins. Co.*, 981 F. Supp. 2d 386, 406–07 (W.D. Pa. 2013) (applying deferential arbitrary and capricious standard after considering identical "court will determine standard of review" language).

"A decision is arbitrary and capricious only if it is found to be 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance."  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (internal quotation marks omitted).  "As applied to a motion for summary judgment, 'the arbitrary and capricious standard requires that [the Court] ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.'"  *Wedge*, 23 F. Supp. 3d at 333–34 (quoting *David v. Commercial Bank of New York*, 275 F. Supp. 2d 418, 425 (S.D.N.Y. 2003)).  "In other words, [First Unum's] decision must be upheld unless it is not grounded on *any* reasonable basis."  *Id.* (citation and internal quotation marks omitted).  "[I]n cases where the evidence conflicts, an administrator's conclusion drawn from that evidence that a claim should be denied will be upheld unless the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator."  *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 212 (2d Cir. 2015).  The Court is "not free to substitute [its] own judgment for that of the insurer as if [it]

were considering the issue of eligibility anew." *Hobson*, 574 F.3d at 83–84 (internal quotation marks omitted).

"Finally, in reviewing a claim for benefits under ERISA, 'a district court's review under the arbitrary and capricious standard is limited to the administrative record.'" *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 481 (S.D.N.Y. 2015) (quoting *Miller*, 72 F.3d at 1071).

## III. DISCUSSION

It is Plaintiff's burden to prove that he is disabled and entitled to benefits under the Plan. *Wedge*, 23 F. Supp. 3d at 334 (citing *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004)). The question is thus if a genuine issue of material fact exists as to whether First Unum's decision was not reasoned or based on substantial evidence, or if it was erroneous as a matter of law. Here, the record contains far more than a "scintilla" of evidence that Plaintiff was not "disabled" on or before May 11, 2011,[7] and thus a reasonable juror could not conclude that First Unum's decision was arbitrary and capricious.

### A. Vocational Requirements

First, First Unum's determination of the "material and substantial duties" of Plaintiff's "regular occupation" was reasoned and supported by substantial evidence. Plaintiff argues that First Unum's reviewers "made up a job description" and arbitrarily "reduce[d]" the requirements of Plaintiff's job in order to make sure that the physical restrictions and limitations suggested by Dr. Semble would not prohibit Plaintiff from performing his occupation. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") (Doc. 25) at 3; Plaintiff's Memorandum of Law in Reply ("Pl.'s Rep.") (Doc. 28) at 3–

---

[7] While noting the discrepancy over whether Plaintiff's last day in the office was April 27 or May 11, First Unum maintains that its position that Plaintiff did not prove that he became "disabled" prior to his last day of active employment applies regardless of which of the two dates applies. Defendant's Reply Brief in Support of its Summary Judgment Motion ("Def.'s Rep.") (Doc. 27) at 2–3.

4.  But the record demonstrates that the reviews relied on job title and descriptions obtained directly from Viacom and Plaintiff himself, as well as information from the Enhanced Dictionary of Occupational Titles.  AR 417–18.  Rather than challenge the use of these sources or the reasoning of the reviews themselves, Plaintiff instead argues that First Unum ignored the following duties of his "regular occupation":  (i) the ability to twist his spine so as to use multiple computers at once, (ii) mobility required to use "three computers, a telephone headset and to access paper files and documents…all at the same time," (iii) the ability to sit for "significant" periods of time while using "high mental acuity."  Pl.'s Opp'n at 3; Pl.'s 56.1 ¶ 22; Pl.'s 56.1 Resp. ¶ 36; AR 574.  First Unum did not ignore these tasks, but rather consistently took the position that the simultaneous use of multiple computer screens, the telephone, and paper files were not "material and substantial duties" of Plaintiff's occupation as defined by the Plan, because Plaintiff could continue to perform these tasks (or their functional equivalents) with use of reasonable modifications like an ergonomic work setup and a phone headset.  AR 616, 624.[8]  Drs. Bruno and Dempsey appeared to believe as much as well, at least up until July 2011.  Moreover, the specific tasks identified by Plaintiff are nowhere to be found in Viacom's description of the job, and Plaintiff did not submit any actual evidence that the tasks could not be "reasonably omitted or modified,"[9] relying only on his own assertions that he used to engage in these particular tasks when performing his specific job at Viacom.  Without more, First Unum was well within its discretion to exclude those Plaintiff-specific tasks from its interpretation of the "material and substantial duties" of Plaintiff's "regular occupation," within the meaning of

---

[8] First Unum also plainly did not "ignore" the requirement of sitting for "significant" periods of time, seeing as how the vocational analysis set forth by Peavy and adopted as First Unum's interpretation of Plaintiff's "regular occupation" explicitly included "constantly sitting."  AR 541.

[9] Again, the Plan defines "material and substantial duties" to mean those duties "normally required for the performance of your regular occupation" that "cannot be reasonably omitted or modified."  AR 90.

the Plan.  *See, e.g.*, *Robbins v. Aetna Life Ins. Co.*, No. 03 Civ. 5792 (NGG), 2006 WL 2589359,

at *9 (E.D.N.Y. Sept. 8, 2006) ("As the plan documents grant Aetna discretion to construe the

policy terms in any reasonable manner, Aetna is entitled to utilize any reasonable definition of

Plaintiff's occupation that reflects her material job duties."); *Couture v. UNUM Provident Corp.*,

315 F. Supp. 2d 418, 433–34 (S.D.N.Y. 2004) ("The record contains sufficient evidence tending

to show that plaintiff could continue to perform the important functions of his occupation.

'Where both the [administrator] and a spurned claimant offer rational, though conflicting,

interpretations of plan provisions, the [administrator's] interpretation must be allowed to

control.'") (quoting *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92–93 (2d Cir. 2000)).

### B.  Weight of the Medical Evidence

Next, upon review of the entire administrative record, the Court finds that First Unum's

determination that Plaintiff was not "disabled" as of his last day of employment was well

reasoned and supported by substantial evidence.  The reports by First Unum's three assigned

doctors—Drs. Hauser, Sentef, and Bartlett—all included detailed reviews of all the medical

evidence and cogent analyses leading to the conclusion that Plaintiff could have performed

required occupational demands up to his last day at work, so long as he had ergonomic

accommodations.  Additionally, First Unum's doctors put particular weight, reasonably so, on

Dr. Semble's independent medical examination, which proffered certain restrictions and

limitations that First Unum's doctors found to be both reasonable and not prohibitive of

Plaintiff's returning to work in his occupation.  Whether or not the medical opinions of Drs.

Bruno and Dempsey are fairly read as contrary to those of First Unum's doctors, the reviews by

Drs. Semble, Hauser, Sentef, and Bartlett, along with the vocational analyses by Peavy and

Byard, all "constituted more than a scintilla of evidence that [Plaintiff did not qualify] as

disabled within the meaning of the Plan." *Ingravallo v. Hartford Life & Acc. Ins. Co.*, 563 F.

App'x 796, 800 (2d Cir. 2014) (citation and internal quotation marks omitted); *Durakovic*, 609

F.3d at 141 (holding that administrator's decision was supported by substantial evidence even

though Plaintiff "submitted multiple medical reports supporting her disability"); *Asberry*, 2015

WL 857883, at *5 (finding that reports from administrator's doctors and occupational analyst

were "more than sufficient to constitute substantial evidence supporting [administrator's]

decision").

Equally as significant as the affirmative opinions of First Unum's reviewing doctors and

Dr. Semble, the record is devoid of contemporaneous evidence demonstrating that Plaintiff was

unable to perform his occupation prior to his termination.  Drs. Bruno and Dempsey concurred,

based on Plaintiff's two visits on January 26, 2011, that Plaintiff could return to work despite his

injury so long as he received ergonomic assistance.  *See* AR 210, 298; Pl.'s 56.1 ¶¶ 14–15;

Def.'s 56.1 ¶ 14.  Dr. Dempsey did not comment on Plaintiff's ability to work based on his

March 2, 2011 visit.  AR 235.  Despite later contentions that April 27, 2011 was the day Plaintiff

was ordered to stop working by his doctors, there is no record of any communication between

Plaintiff and his doctors, let alone an order to stop working, on that day (or indeed any day

between March 2 and May 11).  Rather, notes from Dr. Dempsey on May 11, 2011 and from Dr.

Bruno on May 16, 2011 both state that Plaintiff had been "laid off" or "lost" his job—and neither

even implies that Plaintiff was told to stop working by his doctors.  *See* AR 211, 260.  To the

contrary, Dr. Dempsey's note from May 16, 2011 categorized Plaintiff as only "partially

disabled" and strongly suggested that Plaintiff was still able to work so long as he received

ergonomic assistance.  AR 110.  Dr. Bruno's letter from May 23, 2011 plainly stated that

Plaintiff's symptoms had "worsened" since January due to regular computer and phone use, but

again the letter does not contain any mention of a doctor's order to stop working.  AR 111.[10]  It

was not until July 5, 2011 that either of his doctors suggested that Plaintiff was unable to work as

a result of a disability as of April 27, 2011, despite numerous visits with his doctors during that

time frame.  It is undisputed that Plaintiff was able to work from January 26, 2011 to April 27,

2011—indeed, Plaintiff attended work most of those days—and thus it was not arbitrary or

capricious for First Unum to question whether Plaintiff suddenly stopped being able to perform

his occupation on or before May 11, 2011, without any doctors notes or other contemporaneous

evidence establishing as much.  *See St. Onge v. Unum Life Ins. Co. of Am.*, 559 F. App'x 28, 30

(2d Cir. 2014) (holding that plan administrator did not "deliberately ignore[]" competing

doctor's opinion where that opinion "was consistent with Unum's ultimate decision" because it

indicated that Plaintiff could perform her job with accommodations that employer was willing to

provide).[11]

Plaintiff attacks the reliability of First Unum's reviewers by arguing that Drs. Hauser,

Sentef, and Bartlett made only "cursory" reviews of the medical evidence, failed to "detail their

disagreements with the treatment and progress notes," and failed to explain why the evidence led

to their conclusion that Plaintiff was not disabled.  Pl.'s Br. at 9; Pl.'s Opp'n at 2–3.  But Plaintiff

---

[10] The Court also notes that Plaintiff's own briefing, in two different spots, separately claims that both Dr. Dempsey and Dr. Bruno ordered Plaintiff out of work on April 27, 2011.  *Compare* Pl.'s Br. at 2 (Bruno), *with id.* at 4 (Dempsey).

[11] It is not clear from his briefing the extent to which Plaintiff's position relies on the SSDI Award, which was based on a finding that Plaintiff was disabled as of April 27, 2011.  *See* AR 637.  Regardless, the Court notes that Plaintiff submitted the SSDI Award three months after First Unum completed its review of his appeal.  And even if First Unum had the opportunity to review the SSDI Award, it was free to reach a different conclusion so long as it was supported by substantial evidence.  *See DeCesare*, 95 F. Supp. 3d at 486 (noting that administrator's failure to explain its disagreement with Social Security award "does not render a plan's determination arbitrary and capricious if there is nonetheless substantial evidence to support the denial") (citing *Hobson*, 574 F.3d at 92); *VanWright*, 740 F. Supp. 2d at 405 ("[W]hile the SSA's determination can inform [a] [c]ourt's review, it is not dispositive….").  Moreover, the Court is compelled to note the oddity of Plaintiff's brazen reliance on a Social Security award made to "Gregory Hudson," which was put into the record without any representation that Plaintiff is legitimately entitled to use this "alias" in connection with receipt of government funds.  Because Plaintiff does not rely on it and because First Unum did not consider it, however, the Court will not make any findings with respect to this purported award.

simply mischaracterizes the record.  Dr. Hauser engaged in a lengthy review of all the medical

evidence submitted and provided at least nine distinct points of analysis to support his

conclusion, which basically took the medical records as facially true (rather than "disagreeing"

with them, as Plaintiff argues), and noted the ways in which those records failed to prove that

Plaintiff had a disability under the Plan.  *See* AR 495–98.  Likewise, both Dr. Sentef and Dr.

Bartlett provided a detailed summary of Plaintiff's medical records, and both set forth discrete

explanations for why each of Plaintiff's diagnoses did not rise to the level of a disability,

providing concrete reasons for the inferences both were drawing from the medical evidence.  AR

513–17; AR 608–14.  These were far from "cursory" reviews.  *See DeCesare*, 95 F. Supp. 3d at

488 ("There is nothing in the record to suggest that Defendants ignored Plaintiff's medical

records. To the contrary, [Defendant's reviewing doctors] reviewed DeCesare's records

(including MRIs and X-rays) and spoke with or attempted to contact his treating physicians.");

*Short v. UNUM Life Ins. Co. of Am.*, No. 302 Civ. 827 (MRK), 2003 WL 22937720, at *7 (D.

Conn. Dec. 3, 2003) ("[T]his is not a case in which a plan administrator refused to credit the

views of a claimant's treating physicians.  To the contrary, UNUM relied heavily on the

numerous medical reports that plaintiff's treating physicians had submitted or prepared over an

approximately three-year period.") (citing *Maniatty v. UNUMProvident Corp.*, 218 F. Supp. 2d

500, 504 (S.D.N.Y. 2002)).[12]

---

[12] Plaintiff argues that First Unum's review was flawed because its doctors never independently examined the Plaintiff. Pl.'s Br. at 9.  First Unum was under no mandatory requirement to examine Plaintiff in person, however, and its failure to do so is "not dispositive" here.  *Schrom v. Guardian Life Ins. Co. of Am.*, No. 11 Civ. 1680 (ALC), 2013 WL 1143633, at *8 (S.D.N.Y. Mar. 19, 2013).  "[I]t is well settled that, in denying a claim for benefits under ERISA, the plan administrator may rely on the opinion of independent medical reviewers who have not conducted an examination of the applicant, even where the reviewer's opinion conflicts with that of the treating physicians." *Zoller v. INA Life Ins. Co. of New York*, No. 06 Civ. 112 (RJS), 2008 WL 3927462, at *13 (S.D.N.Y. Aug. 25, 2008); *see also Hobson*, 574 F.3d at 91 ("[W]here the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled.").  Plaintiff also objects to the fact that Dr. Hauser "did not actually speak with any of the treating and diagnostic physicians" and made only "perfunctory attempts" at contact.

Plaintiff also maintains that Drs. Hauser, Sentef, and Bartlett all "cherry-picked information from medical records" and "blinded themselves" to the "circumstantial evidence" showing that Plaintiff's condition deteriorated from January 26, 2011 to April 27, 2011 due to repetitive motion at his job and Viacom's failure to provide him with an ergonomic workstation. Pl.'s Br. at 10; Pl.'s Opp'n at 3; Pl.'s Rep. at 3. There is no indication, however, that First Unum's reviewing doctors concluded that Plaintiff's condition was stable from January to April. Rather, they all appeared to accept the possibility of deterioration, but found it more probative that the May 2011 notes from Drs. Bruno and Dempsey, which Plaintiff singles out as the key "circumstantial evidence" showing deterioration from January to April, Pl.'s Rep. at 3 (citing AR 110, 297), both acknowledged such deterioration and yet said nothing about Plaintiff's ability to work. Dr. Semble's independent examination further solidified in the minds of First Unum's doctors that, even five months later, Plaintiff's condition had not deteriorated so badly as to totally preclude his performing the physical requirements of his occupation.

Plaintiff also argues that First Unum should have looked at evidence of Plaintiff's worsening condition after the end of the elimination period to infer that Plaintiff suffered disability during the elimination period, instead of "discounting" that evidence "entirely." Pl.'s Br. at 9–10; Pl.'s Opp'n at 3. To be sure, Plaintiff's position is supported by the written statements made by Drs. Bruno and Dempsey in July and August of 2011, as well as the series of letters from Dr. Bruno throughout the remainder of 2011 and 2012, which explicitly state that Plaintiff is indefinitely disabled and unable to return to work. But these statements are not

---

Pl.'s Opp'n at 2; Pl.'s 56.1 Resp. ¶¶ 38–41. While Plaintiff may view the attempts as "perfunctory," the Court's review is strictly limited to the administrative record, and Plaintiff has not put in any evidence that contradicts or undermines Dr. Hauser's attempts to contact Drs. Bruno or Dempsey. Nor does he appear to dispute that Dr. Dempsey had retired and could not be contacted. The mere fact that First Unum's contact attempts were unsuccessful does not render its overall determination arbitrary and capricious.

dispositive and do not overwhelm the contrary evidence upon which First Unum relied. *See Roganti*, 786 F.3d at 212 ("[I]f the administrator has cited 'substantial evidence' in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious.") (citing *Durakovic*, 609 F.3d at 141). First Unum was not required to afford the opinions of Drs. Bruno and Dempsey any special weight simply by virtue of their status as Plaintiff's treating doctors, nor was First Unum required to provide discrete explanations as to why it chose to credit the opinions of its own reviewing doctors over those of Plaintiff's treating doctors. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). Furthermore, the Court again observes that Dr. Dempsey's August 2011 note is inconsistent with the note he filled out in May 2011, with no apparent basis for that change. *Compare* AR 168, *with* AR 110; *see also Connors v. Conn. General Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001) (noting that the court may evaluate a treating physician's opinion based on "the compatibility of the opinion with the other evidence"). Perhaps most importantly, both First Unum and its reviewing doctors were well within their discretion to afford more weight to evidence most contemporaneous with the critical dates of April 27, 2011 and May 11, 2011; it was reasonable to discount the probative nature of arguably contradictory notes written months later. *See Tretola v. First Unum Life Ins. Co.*, No. 13 Civ. 231 (PAE), 2015 WL 509288, at *23 (S.D.N.Y. Feb. 6, 2015) ("In assessing Tretola's medical conditions, the Court places particular weight on the medical opinions most contemporaneous with February 14, 2012, the date on which First Unum determined she was not disabled, while giving due consideration to

evaluations earlier in time."); *Kellner v. First Unum Life Ins. Co.*, 589 F. Supp. 2d 291, 307–08 (S.D.N.Y. 2008) ("All of these records are dated well after January 20, 2001—the date Kellner claims she became disabled.  Accordingly, it was not an abuse of discretion for Defendant to rely on Dr. Reeder's analysis of Kellner's pre-January 20, 2001 medical records rather than treating the after-prepared notes of Kellner's physicians as dispositive of Kellner's condition."); *Graham v. First Reliance Standard Life Ins. Co.*, No. 04 Civ. 9797 (NRB), 2007 WL 2192399, at *2, 4 (S.D.N.Y. July 31, 2007) ("A physician's opinion is more credible when supported by medical and vocational evidence of contemporaneous functional limitations….Without sufficient evidence contemporaneous to his termination of employment, the plaintiff instead relies on medical records submitted from a later time period.  However, these records do not adequately demonstrate the severity of his disability during earlier periods of time.").  First Unum had a reasonable basis to remain skeptical of the post-hoc assertions from Drs. Bruno and Dempsey that Plaintiff was ordered not to go into work as of April 27, 2011 and had remained disabled since, especially because First Unum's conclusion was based in large part on the earlier notes of those same treating doctors.  *Cf. Short*, 2003 WL 22937720, at *7–8 (reasoning that administrator was "properly skeptical of what it perceived as an unjustified about-face" by treating doctor).[13]  Plaintiff may argue that First Unum "ignored" the competing opinions of his

---

[13] Plaintiff's briefs rely heavily on *Donachie v. Liberty Life Assur. Co. of Boston* in arguing that First Unum's reviewing doctors "ignored the consistent and uniform conclusions of the treating physicians" and substituted their own opinions without any analysis.  *See* Pl.'s Br. at 10; Pl.'s Opp'n at 4.  *Donachie*, however, involved a much more egregious and one-sided determination by the plan administrator.  There, the administrator denied benefits based solely on the report of one in-house doctor who, against the opinions of two other doctors, (i) refused to undertake an in-person psychiatric evaluation of the plaintiff despite unanimous agreement from the other treating and independent doctors that one was needed prior to a determination of the benefits claim, (ii) used generic criteria to question Plaintiff's lack of certain symptoms while ignoring evidence that explained why those symptoms would not be likely given the plaintiff's specific condition, (iii) did not attempt to confer with plaintiff's treating doctors, and (iv) ignored reports from plaintiff's employer about plaintiff's deteriorating performance and work, relying instead on evidence of plaintiff's general life activities to conclude that plaintiff was not disabled.  *See Donachie v. Liberty Life Assur. Co. of Bos.*, No. 04 Civ. 2857 (ARL), 2009 WL 8627379, at *5–6 (E.D.N.Y. Mar. 10, 2009), *report and recommendation adopted*, No. 04 Civ. 2857 (RRM), 2012 WL 2394829 (E.D.N.Y. June 25, 2012), *aff'd in part, vacated in part*, 745 F.3d 41 (2d Cir. 2014).  The administrator, in other words, relied "exclusively on its own

treating doctors, but at bottom he is merely "referenc[ing] disputes among medical experts as to [his] physical condition, [and] *those* disputes fall precisely within the discretion of the plan administrator to resolve."  *Kruk v. Metro. Life Ins. Co.*, 567 F. App'x 17, 19 (2d Cir. 2014).

Plaintiff also points to the January 2012 MRI as evidence of his post-elimination period condition that First Unum ignored instead of using it to infer Plaintiff's disability during the elimination period.  *See* Pl.'s Opp'n at 3; Pl.'s Rep. at 2–3.  But the determination letters from First Unum and the reports from Drs. Hauser, Sentef, and Bartlett all explicitly discussed the MRI.  *See* AR 497, 515, 541, 609, 622.  They concluded that the MRI's left-side-heavy findings did not support a conclusion that Plaintiff was disabled over six months prior, based predominantly on complaints of right-side symptoms.  This was consistent with Dr. Semble's opinion that Plaintiff's injuries did not "appear to be consistent with the minimal rotary incident that occurred on January 25, 2011," AR 289, which was part of the overall opinion that Dr. Semble expressly said did not change after his review of the MRI, AR 175.[14]

---

consultative source without an evaluation of plaintiff, effectively ignoring [the treating doctor's] observations, the observations from plaintiff's employer of his work performance, and the clear statements from plaintiff regarding his inability to perform his job."  *Donachie*, 2012 WL 2394829, at *3.  Plaintiff has come nowhere near identifying similar one-sided determinations by First Unum in this case.

The same can be said for Plaintiff's reliance on *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38 (2d Cir. 2009). Pl.'s Rep. at 4.  In *Slupinski*, the plaintiff's inability to work was consistently found by *eight* separate physicians. *Slupinski*, 554 F.3d at 44.  The district court, engaging in *de novo* review, disagreed with the plan administrator's decision to rely on the only three "exceptions" to this wide-ranging consensus, because: (i) one statement that the plaintiff was able to work came from a doctor who had stated the exact opposite the last time he had actually seen plaintiff in person; (ii) another statement that the plaintiff was able to work was found in a doctor's form that included "numerous contradictory and equivocal statements," including the statement that plaintiff was "unable to work even part time," and (iii) the administrator's in-house reviewer failed to credit, without reason, "many letters from multiple neurologists, physiatrists, and neurosurgeons" that uniformly found plaintiff to suffer from disabling pain.  *Id.* at 44–45.  Again, the administrator's failure to credit the overwhelming weight of the evidence based on three unreliable and unpersuasive "exceptions" in *Slupinski* is not an accurate analog for First Unum's determination in the instant case.

[14] Plaintiff argues that Dr. Hauser should not have "belittle[d]" the significance of right-side MRI findings simply because there was more severe left-side findings, especially where Drs. Bruno, Dempsey, and Semble all found Plaintiff to suffer from right-side symptoms during their examinations.  Pl.'s Rep. at 3.  While the Court would find it problematic if Dr. Hauser had rested his opinion solely or predominantly on this finding, his noting of this

Plaintiff next accuses First Unum of failing to credit the impact that side effects from his pain medication could have on his ability to sustain high levels of mental acuity during the workday. *See* Pl.'s Rep. at 4; Pl.'s 56.1 Resp. ¶¶ 45–46, 54. Again, however, First Unum's reviewers did not ignore this possibility—they explicitly considered it, but all agreed that the medical records did not provide any objective evidence that Plaintiff ever actually suffered from such side effects while he was covered under the Plan. *See* AR 498, 517, 614. Plaintiff debatably concedes as much in his response to First Unum's statement of undisputed facts. *See* Pl.'s 56.1 Resp. ¶ 45 ("Fact that records may not have reflected fact that patient presented at office with mental impairment from medication is not significant."), ¶ 54 ("[N]o showing that plaintiff was taking the medication at the time of his examination"). First Unum's determination that potential side effects from pain medication did not render Plaintiff "disabled" under the Plan was thus reasonable and supported by substantial evidence. *See Hobson*, 574 F.3d at 89 (finding no abuse of discretion plaintiff "failed to explain how exactly she had established to [the administrator] that her medications rendered her unable to work" by, for example, providing "letters from her treating physicians opining that her medications hindered her functional abilities").

### C. Conflict of Interest

Finally, Plaintiff seeks to overturn the denial of his claim based on the fact that First Unum "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," which is undisputedly a structural conflict of interest "that a reviewing court should consider…as a factor in determining whether the plan administrator has abused its discretion in

---

inconsistency as one of many reasons why he did not think Plaintiff was "disabled" prior to termination does not render First Unum's determination arbitrary and capricious.

denying benefits."  *Glenn*, 554 U.S. at 108.[15]  "The weight properly accorded a *Glenn* conflict

varies in direct proportion to the 'likelihood that the conflict affected the benefits decision.'"

*Durakovic*, 609 F.3d at 139 (quoting *Glenn*, 554 U.S. at 117).

First Unum argues that it took many steps "that are well established" as serving to

"prevent[] the conflict from affecting the determination," including "assigning multiple

individuals to review the claim," "obtaining multiple medical reviews of the evidence," and

"contacting treating physicians to obtain additional medical information."  Def.'s Opp'n at 4.

Plaintiff has not disputed any of these points, nor has he put in any other evidence tending to

show that the structural conflict *actually affected* First Unum's decision in this case.  *See*

*Durakovic*, 609 F.3d at 139 ("No weight is given to a conflict in the absence of any evidence that

the conflict actually affected the administrator's decision.") (citing *Hobson*, 574 F.3d at 83).  For

example, the record contains no evidence of First Unum's history of biased claims

administration, or evidence of an incentive structure whereby First Unum's reviewers are

compensated for denials.  *See, e.g.*, *St. Onge*, 559 F. App'x at 31–32 (finding "no evidence that

the conflict affected the disability decision" where there was no history of bias, "numerous

independent physicians and vocational evaluators," and direct consultation with treating

physicians); *Asberry*, 2015 WL 857883, at *10 ("Courts within this Circuit have held that

ensuring that an examiner's compensation is not determined by reference to his or her record in

denying claims is sufficient to wall-off the claims examiners from the finance department,

thereby mitigating the conflict of interest.") (citations and internal quotation marks omitted).

Even were the Court to weigh the structural conflict present here in Plaintiff's favor, First

---

[15] "[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate."  *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008).

Unum's overall determination was not so unreasonable or unsupported by substantial evidence as to render that conflict outcome determinative. *See VanWright*, 740 F. Supp. 2d at 405 ("The presence of a conflict of interest should be dispositive only as a 'tiebreaker,' and is not relevant when the conflicted party's conduct cannot otherwise be characterized as arbitrary or capricious.") (citations omitted).

### D. Breach of Fiduciary Duty

Plaintiff's claim for breach of fiduciary duty is premised exclusively on First Unum's "wrongful denial of Plaintiff's claim for disability" and the resultant "undue delay" in payment of those benefits. Complaint (Doc. 1) ¶ 58. Since the Court has already granted summary judgment in favor of First Unum regarding its denial of Plaintiff's claim for benefits, summary judgment is also warranted in First Unum's favor on Plaintiff's fiduciary-duty claim.[16]

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and First Unum's motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motions (Docs. 12, 18) and to close this case.

It is SO ORDERED.

Dated:     March 23, 2016
           New York, New York

                                        Edgardo Ramos, U.S.D.J.

---

[16] The Court also notes that Plaintiff has not made any arguments specific to his fiduciary-duty claim in any of his briefs, and thus the Court has no grounds for finding that he could even assert such a claim, absent a showing that the remedy for wrongful-denial of his benefits claim under § 1132(a)(1)(B) was inadequate. *See Hilbert v. The Lincoln Nat'l Life Ins. Co.*, No. 15 Civ. 0471 (SHR), 2015 WL 8150418, at *4 (M.D. Pa. Dec. 8, 2015) (finding "no need" for relief for fiduciary breach where "the only injury Plaintiff ultimately purports to have suffered is a wrongful denial of benefits,...as any potential fiduciary breach can be fully remedied by an award of benefits under § 1132(a)(1)(B)") (citing *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 374–75 (6th Cir. 2015)).